Estate of Charles T. Smith, Deceased, C. Richter Smith, Executor v. Commissioner.
Estate of Smith v. Commissioner
Docket No. 108998.
United States Tax Court
1943 Tax Ct. Memo LEXIS 479; 1 T.C.M. (CCH) 518; T.C.M. (RIA) 43053; January 30, 1943
*479 Thos. D. Seals, C.P.A., 1323 Citizens & Southern Nat'l Bank Bldg., Atlanta, Ga., and Walter Visanska, Esq., 1006-22 Marietta St., Bldg., Atlanta, Ga., for the petitioner. J. Marvin Kelly, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This case arises from the Commissioner's determination of a deficiency in estate taxes in the matter of the estate of Charles T. Smith, deceased, in the amount of $4,574.43, the entire amount of which is in controversy. Petitioner contends that the respondent erred in including in the gross estate of decedent the value of thirteen life insurance policies which decedent, during his lifetime, assigned to his son. Findings of Fact Part of the facts herein have been stipulated by the parties and we find them to be as stipulated. They are substantially as follows: Charles T. Smith, a resident of Concord, Georgia, died on April 24, 1939, leaving a will dated July 20, 1935, by which his entire estate was bequeathed to his only son, C. Richter Smith, and in which he directed that his son be appointed executor of the will. C. Richter Smith was appointed and qualified as such executor on May 1, 1939, the date on which the will was *480 probated. On July 30, 1935, Charles T. Smith wrote the following letter to his son: I am assigning and transferring to you, the following list of life Insurance Policies and I relinquish the right to exercise any rights or options heretofore held on these policies. The list is as follows: Penn Mutual
No. 546,325
$7,660
Value
$2,100
Penn Mutual
No. 607,660
10,000
Value
2,500
Penn Mutual
No. 819,684
20,000
Value
5,050
Metropolitan
No. 5411,858
10,000
Value
1,236
Metropolitan
No. 5462,275
10,000
Value
1,236
Metropolitan
No. 6006,100
10,000
Value
1,236
Metropolitan
No. 6006,101
10,000
Value
1,236
Mutual Benefit
No. 694,078
10,000
Value
5,080
Mutual Benefit
No. 733,976
10,000
Value
5,080
Mutual Benefit
No. 1595,015
11,534
Value
1,051
Mass. Mutual
No. 199,213
10,000
Value
4,200
North Western
No. 437,106
3,000
Value
2,500
North Western
No. 472,824
5,000
Value
3,000
$127,194
$35,805
I trust you will be able to handle this insurance in a real successful manner and I am sure you will. I am wishing you and your family much pleasure in the use of it. On July 31, 1935, C. Richter Smith wrote the following letter to his *481 father: This acknowledges the transfer to me of the thirteen life insurance policies, listed in your letter of July 30th. I appreciate extremely much the faith which you have in me, in this matter, and will accept and do my best with these responsibilities. There were no loans against any of the insurance policies so assigned previous to the value of the assignment, but immediately upon receipt thereof, the transferee began to place loans against the policies, and the transferee, after receipt of the policies, assumed the responsibility of and did pay the premiums on all of said policies until the death of the transferor. On April 24, 1939, the date of the donor's death, the transferee had placed loans aggregating $52,926.10 against said policies, and had paid premiums thereon totaling $26,671.77. The total amount payable to the donee pursuant to these policies was $126,001.37. This sum, less the premiums paid by the donee, amounted to $99,329.60. As against this amount the estate is entitled to the remainder of the $40,000 exemption for insurance payable to specific beneficiaries, not claimed in the original estate tax return, in the sum of $36,872.95. Therefore, the amount of *482 taxable values in controversy is $62,456.65. From the evidence adduced at the hearing herein, we find the following additional facts: Decedent was a man of exceptionally vigorous health throughout his life until, almost four years after the transfers in question, he was stricken with the heart attack which resulted in his death five days later. He was extremely active in the conduct of his own business affairs and in the civic and business life of his community, and continued so until his last illness. He was about 70 years old when he executed the assignments in question, and about 74 when he died. The insurance so assigned had been purchased from time to time, pursuant to an understanding between decedent and his wife in the early years of their marriage that her share of their property would be represented by such insurance, which would guarantee her security in her old age. Decedent had therefore always considered the insurance policies to be the property of his wife, who had long been in very bad health. Decedent's wife died in June, 1935, and shortly thereafter decedent gave the insurance policies to his son. The relationship between decedent and his son and the latter's *483 family was affectionate and close. The son and his family lived with decedent during the last three and a half years of his life. During 1935 the son needed financial assistance from his father because of the bad health of his wife which had required a major operation in 1934 and was to require another major operation in 1936, and the fact that his oldest son (decedent's grandson) was about to enter college. The policies in question were transferred to the son with the understanding that he could borrow thereon and thus obtain money with which to meet his domestic obligations, such as the payment of doctor's bills, the education of his children and general household expenses. The gross income of decedent's son for the year 1935 was $3,280. Before making his last will in 1935, decedent had executed two prior wills. By the first of these, executed when his son was a small boy, he left all of his property to his wife. By the second, executed after the maturity of his son and the illness of his wife, he left the real estate and business interests to the son, and the insurance to his wife. Before the gift in question was made, decedent had made numerous other gifts to his son, totaling *484 in value more than $25,000. Shortly after the death of his wife, and about ten days before the transfer involved here, decedent executed a new will, revoking an earlier will in which his wife had been a principal beneficiary. Decedent's dominant motives for making the transfer here in question were to give needed financial assistance to his son and his son's family, and to fulfill a moral obligation under which he considered himself to be, to give to his son the property interests in these insurance policies which he considered the boy's mother to have owned, in view of her recent death which relieved him of the responsibility of providing for her old age. The transfer here involved was not in the nature of a testamentary disposition of decedent's property, and was not made in contemplation of death. Opinion KERN, Judge: The sole issue presented in this proceeding is whether or not the life insurance policies were transferred by decedent in contemplation of death, and therefore subject to inclusion in his gross estate for estate tax purposes. Decedent died on April 24, 1939, at the age of 74 years, of an acute coronary attack of the heart, suffered five days earlier, and apparently *485 the only such attack he had ever had. He was a man of exceptionally robust health, never having known a day of serious illness in his entire life. He led an active, vigorous life, and was prominent in the business, civic and social affairs of his community. He was the head of an extensive nursery business, president of a bank, and interested in several other business and civic enterprises, in all of which his active participation continued until the date of his last illness. Decedent's relationship with his son, and his son's family, is shown to have been extremely affectionate and close, and that family resided with him for more than 3 1/2 years before his death. Decedent's wife died in June of 1935, and very soon, about six weeks, thereafter, decedent made a new will in favor of his son, revoking an earlier will in which both his wife and son had shared. About ten days after the making of the new will, decedent assigned to his son the insurance policies described in our findings. The son, at that time, was in somewhat straitened financial circumstances, due to the fact that his wife had been in ill health and had undergone a major operation within the preceding year, and the *486 further fact that his oldest son was ready for college that fall. The son's gross income for 1935 was $3,280. Decedent knew of these conditions, and was himself greatly interested in his grandson's college education. The policies were transferred with the understanding that the son could borrow money thereon, and, after paying the premiums, relieve his financial situation with the proceeds of the loan. This plan was followed, and loans totaling $52,926.10 were negotiated within a month or so thereafter; and premiums totaling $26,671.77 were paid by the son therefrom. The balance of the sum so secured was used by the son for the education of his children, doctor's bills and general expenses. Since the transfers were made more than two years before the death of the decedent, we are not here concerned with the presumption in favor of the taxability of transfers made within that period. There is no disposition on the part of respondent to question the excellence of decedent's health before, during and subsequent to the date of the transfer, and until the date of his last illness, and we are not asked to infer from the state of his health that he acted in contemplation of death. Respondent *487 relies, rather, upon the coincidence in time of the execution of decedent's last will and the transfer of the insurance policies, and contends that the transfers were made in lieu of a testamentary disposition thereof, and in contemplation of death. There is evidence that the decedent was a man of orderly and disciplined habits, and that he had made other earlier wills at various times in his life, coinciding with changing circumstances within his family life. One of these was executed when his son was a child, in which his wife was the sole beneficiary. Later, after the son reached maturity and became associated with him in the business and the health of decedent's wife failed, a new will was made, in which the business interests were left to the son, and the insurance estate to his wife. After her death, he made another will, leaving everything to his son. This was his last will. In view of the decedent's life-long practice of keeping. his wills in order, conforming to changing conditions, the making of this will, shortly after the death of his wife, one of the two beneficiaries under his then effective will, was undoubtedly the result of her death, rather than in contemplation *488 of his own death, in any more immediate sense than "the general expectation of death which all entertain", but which does not suffice to invoke the operation of the statute. The decedent had always regarded the insurance policies as belonging to his wife, pursuant to an understanding arrived at in the early years of their marriage that her share of the property which they acquired would be represented by such insurance. From time to time throughout their married life, and as he prospered in business, he purchased additional insurance, which he always considered as belonging to her. Upon her death, he felt that the policies were, in a sense, her estate, and that, in transferring them to his son, he was fulfilling a moral responsibility toward his wife and son. Decedent had also made a practice of giving money and property of substantial value to his son at various times during his mature life. The occasions, and the value of these gifts testify to the existence of a warm, intimate family relationship and a recognition on the part of the decedent of the increasing financial responsibilities and needs of his son. All of these gifts were made from property of decedent exclusive of the *489 insurance, which he felt belonged to his wife. Upon her death, his responsibility for her was extinguished, and the reason for retaining the insurance intact no longer existed. These considerations, together with the knowledge of his son's present needs, furnished the dominant motive for the transfer. Almost the only point upon which there is any unanimity among the many cases involving transfers alleged to have been made in contemplation of death is the recognition that each such case is necessarily unique, and must be decided according to its peculiar facts and circumstances. Virtually every case which has been decided on the point since Chief Justice Hughes delivered the comprehensive discussion of broad principles in , has leaned heavily on that case, and borrowed much of its language, especially the observation that: There is no escape from the necessity of carefully scrutinizing the dominant motive of the donor, in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute. In definition of the phrase "in contemplation of death", the Court said: While the *490 interpretation of the phrase has not been uniform, there has been agreement upon certain fundamental considerations. It is recognized that the reference is not to the general expectation of death which all entertain. It must be a particular concern, giving rise to a definite motive. Probably the most appropriate language of the Wells case to the instant case is the following: If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive. * * * The purposes which may be served by gifts are of great variety. It is common knowledge that a frequent inducement is not only the desire to be relieved of responsibilities, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration of that event. There may be the desire to recognize special needs or exigencies or to discharge moral obligations. *491 The gratification of such desires may be a more compelling motive than any thought of death. Applying the principles of the Wells case to various sets of facts, widely divergent results have been reached in the almost innumerable cases concerned with the question, lending emphasis to the necessity of basing each decision on its own facts. The case which respondent considers most nearly analogous, from the standpoint of the facts, is that of , cert. denied, . But this case is readily distinguishable from that in several important details: the need of the son in the instant case for financial assistance was reasonably well established, while in the Updike case there was admittedly no such need; the decedent here was 70 years old at the time of the gift, in excellent health and showing no signs of age or infirmity, while Updike was more than 85 years old, with greatly impaired eyesight; he transferred substantially all of his estate and received an annuity from his sons thereafter until his death, while the decedent in this case retained all of the property and *492 business interests which he had at the time except the insurance policies, and left a gross estate of about $48,000. The point which must be established in every case is the dominant or compelling motive for the transfer, a question of fact. The state of mind, the motive which prompts the donor to make the transfer, is a fact which must necessarily be determined from his conversation, his acts, or from existing circumstances. Old age is such a circumstance. Yet, as stated in the Wells case, "age in itself can not be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than death, may motivate the transfer". Health and general activity are other facts to be considered. Decedent's health admittedly was, and had been throughout his life, and continued for nearly four years to be excellent. His energy and vitality continued unabated until the very day he was stricken with his last illness. There is no evidence in the record from which we could possibly infer that, at the time of the transfer in question, the decedent acted in contemplation of death, except the bare circumstance of the execution of his will, which, though it is definitely *493 a fact for serious consideration, we believe is otherwise explained. In order to sustain the Commissioner's determination herein, we would be required to disregard not only such direct evidence as we have of the motive of the transferor, but every other circumstantial fact surrounding the incident, and rely wholly upon the circumstances of the nearly contemporaneous execution of the will. This we are not prepared to do. We think the evidence preponderantly establishes the motive of the decedent to have been associated with life, rather than in contemplation of death within the meaning of the revenue act. Decision will be entered for the petitioner.